**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

KEITHEN JONES,                               Case No. 1:14-cv-748
     Plaintiff,                          Dlott, J.
                                             Litkovitz, M.J.
   vs.

COMMISSIONER OF                              **REPORT AND**
SOCIAL SECURITY,                             **RECOMMENDATION**
    Defendant.


Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB).   This matter is before the Court on plaintiff's Statement

of Errors (Doc. 13), the Commissioner's response in opposition (Doc. 18), and plaintiff's reply

memorandum (Doc. 21).

**I.  Procedural Background**

Plaintiff protectively filed his application for DIB in November 2010, alleging disability

since June 25, 2009, due to feet deformity, arthritis, back pain, knee problems, blurred vision,

shoulder pain, obesity, hypertension, depression, and problems with his hands.   The application

was denied initially and upon reconsideration.   Plaintiff, through counsel, requested and was

granted a *de novo* hearing before administrative law judge (ALJ) Anne Shaughnessy.   Plaintiff

and a vocational expert (VE) appeared and testified at the ALJ hearing.   On April 15, 2013, the

ALJ issued a decision denying plaintiff's DIB application.   Plaintiff's request for review by the

Appeals Council was denied, making the ALJ's decision the final administrative decision of the

Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.   If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).   The claimant has the burden of proof at the first four steps of the sequential evaluation process.  *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541,

548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

## B.    The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The [plaintiff] has not engaged in substantial gainful activity since June 25, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The [plaintiff] has the following severe impairments: [o]steoarthritis of the knees and feet; hypertension; and obesity (20 CFR 404.1520(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except for the following limitations: He can stand and/or walk for a total of four hours in an eight-hour workday. He can frequently operate bilateral foot controls. He can occasionally climb ramps, stairs, ladders, ropes or scaffolds, kneel, crouch, or crawl.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).[1]

7. The [plaintiff] was born [in] . . . 1970 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

---

[1]Plaintiff's past relevant work was as a fast food worker and general manager in a fast food restaurant. (Tr. 35, 67).

3

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a)).[2]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from June 25, 2009, through the date of this decision (20 C.F.R. 404.1520(g)).

(Tr. 14-24).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ and the Appeals Council are supported by substantial evidence, and (2) whether the ALJ and the Appeals Council applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In

---

[2]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform work as a cashier II, with 6,000 jobs in the regional economy and 750,000 nationally; a sedentary assembler with 1,300 jobs locally and 158,000 nationally; and a sedentary unskilled inspector with 325 jobs regionally and 36,000 nationally. (Tr. 24, 67-68).

4

deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ and the Appeals Council applied the correct legal standards in the disability determination. Even if substantial evidence supports the conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though the Commissioner's decision was otherwise supported by substantial evidence where the ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Specific Errors**

Plaintiff raises three assignments of error on appeal: (1) the ALJ's residual functional capacity (RFC) formulation lacks substantial support in the record; (2) the ALJ improperly weighed the medical opinion evidence; and (3) the ALJ erred in assessing plaintiff's credibility.

1. Whether the ALJ's RFC formulation is substantially supported by the record evidence.

Plaintiff asserts the RFC assessed by the ALJ is not supported by substantial evidence because it fails to accommodate all of his established limitations. (Doc. 13 at 6-11). Specifically, plaintiff asserts the ALJ's RFC does not properly account for: (1) his "severe" upper extremity impairment that limits his ability to reach and engage in fine manipulation; (2) the limitations presented by his coronary artery disease (CAD); (3) his obesity, which limits his

5

ability to stand and/or walk; and (4) the days of work he would miss due to arthritis flare ups and his other impairments.

### A. The Upper Extremity Impairments

A September 2006 x-ray of plaintiff's right elbow revealed marginal spur formation and mild osteoarthritic changes; no evidence of acute osseous injury was identified.  (Tr. 295, 367). Results from a January 22, 2009 musculoskeletal examination were normal; no swelling or edema was noted.  (Tr. 255-56).  In August 2009, plaintiff treated at Christ Hospital following a foot injury; musculoskeletal examination was positive for myalgias and joint pain and plaintiff exhibited edema and tenderness.  (Tr. 264).

Eli Perencevich, D.O., reviewed the record on March 15, 2011, for disability purposes. (Tr. 78-79).  Dr. Perencevich opined that plaintiff could lift and/or carry 20 pounds occasionally and ten pounds frequently.  (Tr. 78).  Dr. Perencevich did not find that plaintiff suffered from any additional upper extremity limitations.  Leigh Thomas, M.D., reviewed the record on September 20, 2011, on reconsideration.  (Tr. 89-92).  Dr. Thomas opined that plaintiff could lift and/or carry 20 pounds occasionally and ten pounds frequently, and had no limitations in the use of his upper extremities.  (Tr. 90-91)

On October 19, 2011, plaintiff was treated at the emergency room for complaints of right upper extremity pain.  (Tr. 313-14).  Examination revealed tenderness in the right upper extremity, no erythema or significant swelling, and full range of motion in the right elbow and shoulder.  (Tr. 314).

Plaintiff began treating at the Christ Hospital Rheumatology Clinic on October 21, 2011. (Tr. 307-10). Plaintiff reported a history of juvenile idiopathic arthritis[3], morning stiffness, and chronic intermittent joint swelling and pain, worse in the past few years. (Tr. 307). Examination of plaintiff's joints suggested large joint inflammatory arthropathy in the right wrist and elbow. (Id.). Plaintiff had right wrist "fullness" and pain with range of motion; his right elbow was very swollen and he was unable to fully extend it; mild synovitis was noted in the left upper extremity; and his right fist was noted at 80% and left wrist at 100% with mild synovitis. (Tr. 309). Plaintiff was diagnosed with inflammatory polyarthritis of the major joints with active synovitis in the right wrist and elbow and left elbow. (Tr. 310). An x-ray of plaintiff's right hand revealed possible mild soft tissue swelling with no definite joint space narrowing or osseous erosion identified. An x-ray of plaintiff's left wrist revealed erosive changes suggesting possible rheumatoid arthritis, and the joint spaces appeared fairly well-maintained otherwise without evidence of significant osteophyte formation. (Tr. 305-06).

At a follow up exam on December 9, 2011, synovitis and pain were noted in plaintiff's right wrist. (Tr. 303-04). X-rays of plaintiff's hands revealed erosive changes in the left hand, suggesting possible rheumatoid arthritis and possible mild soft tissue swelling in the right. (Tr. 316-17). At a February 25, 2012 follow-up examination in the rheumatology clinic, plaintiff reported that morning stiffness lasted about one hour and that he was still having pain in his joints and wrists. Examination revealed full range of motion in both upper extremities with no synovitis or tenderness; some tenderness in the right wrist and left elbow on range of motion testing; and bilateral fists at 90%. (Tr. 345-46). On April 8, 2012, plaintiff reported morning

---

[3] Juvenile idiopathic arthritis is also known as juvenile rheumatoid arthritis. *See* http://www.mayoclinic.org/diseases-conditions /juvenile-rheumatoid-arthritis/basics/definition/con-20014378 (last visited on Sept. 14, 2015).

7

stiffness lasting one hour to all day and pain in his elbows, wrists, and ankles with swelling and stiffness.   On examination he had full range of motion in his upper extremities with no synovitis or tenderness, 100% fist, and fixed elbow contractures.   He also had pain in the left wrist on range of motion testing.   (Tr. 342-43).   The rheumatologist assessed seronegative inflammatory polyarthritis and likely seronegative rheumatoid arthritis, noting that plaintiff's x-rays were positive for erosions in the left hand metacarpal phalangeal joints consistent with rheumatoid arthritis.   (Tr. 344).   Disease activity was assessed as "mild to moderate."   (*Id.*)

On May 13, 2012, plaintiff treated at the emergency room for complaints of joint pain in his wrists, right elbow, and left knee.   (Tr. 335).   Examination revealed tenderness and mild swelling of the right wrist and elbow with slightly decreased range of motion.   (Tr. 336).   At a subsequent visit with his primary care physician on May 24, 2012, plaintiff reported a flare of right elbow joint pain; his right wrist and elbow were tender with palpation.   (Tr. 382-84).   In August 2012, plaintiff reported morning stiffness and elbow and wrist joint pain.   (Tr. 451-52). Plaintiff had tenderness and decreased range of motion in his right elbow and both wrists and a contracture in his right elbow without swelling or effusion.   (Tr. 454).   On November 5, 2012, plaintiff reported increased pain in his wrists and elbows with intermittent swelling.   (Tr. 395-98).

On February 27, 2013, Reid A. Hartmann, M.D., plaintiff's treating physician since April 2012, completed a Physical Residual Functional Capacity Questionnaire.   (Tr. 997-1001).   Dr. Hartmann reported that he treated plaintiff one to two times per month with the last treatment being provided on February 27, 2013.   (Tr. 997).   Dr. Hartmann listed plaintiff's diagnoses as juvenile idiopathic arthritis, hypertension, CAD, and morbid obesity and stated that plaintiff's

8

prognosis was "fair." (Id.). Dr. Hartmann opined that plaintiff was unable to walk any city

blocks without rest or severe pain; was able to sit for 20 minutes at a time without needing to

stand up; and was able to stand for 10 minutes at a time before needing to rest. (Tr. 999). Dr.

Hartmann further opined that plaintiff was able to stand/walk less than two hours and sit about

four hours in an eight-hour workday; he needed to walk about five to six minutes every 90

minutes; and he required the ability to alternate between sitting, standing, and walking at will.

(Id.). Dr. Hartmann found that plaintiff required unscheduled three-minute breaks from work

every twenty minutes. (Id.). Dr. Hartmann opined that plaintiff was significantly limited in his

ability to reach, handle, or finger. (Tr. 1000). Dr. Hartmann found that plaintiff could only use

his right upper extremity to grasp, twist, or turn objects for twenty percent of an eight-hour

workday; engage in fine manipulation for twenty percent of an eight-hour workday; and reach,

including overhead reaching, for eighty percent of an eight-hour workday. (Tr. 1000). Dr.

Hartmann also opined that plaintiff could lift less than ten pounds occasionally and lift ten

pounds rarely. (Tr. 1001). Dr. Hartmann listed plaintiff's symptoms as "knee joint pain,

limited mobility, [positive] ankle/foot pain, intermittent chest pain w/exertion." (Tr. 997).

When asked to identify the clinical findings and objective signs supporting his conclusions, Dr.

Hartmann stated: "BMI: 52[;] intermittent joint swelling." (Id.).

The ALJ determined that plaintiff's upper extremity impairments were not severe

impairments. (Tr. 16). The ALJ acknowledged that plaintiff received treatment for pain and

swelling in his upper extremities, but she found that "the symptoms have not remained consistent

nor has diagnostic imagery established a pathology for them." (Id., citing Tr. 309, 313, 335,

343, 346). The ALJ further noted that a 2006 x-ray of plaintiff's right elbow showed only "mild

osteoarthritic changes"; a recent radiological study of the right elbow showed only "degenerative arthritis"; October 2011 x-rays of plaintiff's wrists showed "no significant osseous abnormality"; and x-rays of plaintiff's hands showed some erosive changes in the left hand and only "possible mild soft tissue swelling" in the right.   (*Id.*, quoting Tr. 288-301, 319, 368).

Plaintiff asserts the ALJ erred by not finding his upper extremity impairments to be severe.   (Doc. 13 at 7-8, 10-11).   The Commissioner asserts the ALJ reasonably assessed plaintiff's upper extremity impairments and reasonably accommodated such impairments by limiting plaintiff to lifting and carrying no more than 20 pounds at one time and frequent lifting of up to ten pounds.   (Doc. 18 at 6).

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities.   20 C.F.R. § 404.1520(c).   In the physical context, this means a significant limitation upon a plaintiff's ability to walk, stand, sit, lift, push, pull, reach, carry or handle.   20 C.F.R. § 404.1521(b)(1).   Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting.   20 C.F.R. § 404.1521(b).   Plaintiff is not required to establish total disability at this level of the sequential evaluation.   Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act.   *Gist v. Sec'y of H.H.S.*, 736 F.2d 352, 357 (6th Cir. 1984).   An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v.*

10

*Sec'y of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985) (citing *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir. 1984)).   The severity requirement is a "*de minimus* hurdle" in the sequential evaluation process.   *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).   *See also Rogers*, 486 F.3d at 243 n.2.

The ALJ's finding that plaintiff's upper extremity impairments are not severe is not substantially supported by the evidence of record.   Contrary to the ALJ's finding that there is no known pathology for plaintiff's upper extremity symptoms, x-rays from 2011 substantiate seronegative inflammatory polyarthritis and likely seronegative rheumatoid arthritis of the left hand.   (Tr. 316-17, 344).   A rheumatologist in April 2012 noted that plaintiff's x-rays were positive for erosions in the left hand metacarpal phalangeal joints consistent with rheumatoid arthritis.   (Tr. 344).   These findings establish a medical basis for plaintiff's upper extremity impairments.

The ALJ also selectively cited to portions of the objective evidence without acknowledging the balance of the reports.   The ALJ stated that a May 2012 radiological study of plaintiff's "right elbow showed only 'degenerative arthritis.'" (Tr. 16).   The ALJ ignored, however, the limitations noted in the x-ray report: due to plaintiff's elbow contracture, the x-ray technician was unable to position plaintiff's arm properly to obtain the correct views.   (Tr. 368: noting study was "very limited due to inability to position the elbow for true AP and lateral views").   Likewise, the ALJ noted the negative or normal findings on plaintiff's wrists (Tr. 319, noting October 2011 x-rays showed "no significant osseous abnormality" in the right and left wrists), but she failed to note the positive x-ray findings which showed erosion of the finger joints consistent with rheumatoid arthritis.   (Tr. 344).   The ALJ appears to substitute her own

medical opinion for that of plaintiff's treating rheumatologists as to the etiology of his upper

extremity impairments and her selective citations to the objective evidence does not accurately

portray plaintiff's condition. *See Germany-Johnson v. Commissioner of Social Sec.*, 313 F.

App'x 771, 777 (6th Cir. 2008) (noting the ALJ "was selective in parsing the various medical

reports" requiring remand for further consideration). *See also Hurst v. Sec'y of Health &*

*Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) ("[F]ailure to consider the record as a whole

undermines the Secretary's conclusion.").

 In addition, the ALJ stated that plaintiff's symptoms have "not remained consistent" (Tr.

16), but the evidence of record indicates plaintiff regularly complained of pain, swelling,

stiffness, and difficulty using his upper extremities. Plaintiff consistently reported joint pain and

morning stiffness in his upper extremities that lasted anywhere from one hour to a full day. (*Id.*,

citing Tr. 303, 307, 335, 342, 345, 395, 400, 405, 409, 413, 452). Physicians at the

rheumatology clinic have regularly observed reduced range of motion, stiffness, tenderness, and

intermittent swelling and synovitis in plaintiff's upper extremities. *See, e.g.,* Tr. 307-09 (joint

exam in October 2011 showed predominantly large join inflammatory arthropathy in the right

wrist and elbow; right elbow very swollen and unable to fully extend; shoulder pain with range of

motion); Tr. 310 (October 2011: inflammatory polyarthritis of major joints with active synovitis

in right wrist, right elbow, left elbow, knees and bilateral ankles); Tr. 336 (May 2012: tenderness

of right wrist and elbow, with mild swelling of right wrist and slight decreased range of motion);

Tr. 454 (August 2012: seronegative inflammatory arthritis likely progression of juvenile

idiopathic arthritis; exhibits decreased range of motion and tenderness right and left wrists;

exhibits tenderness, and "decreased range of motion and deformity (Contracture)" of right

elbow); Tr. 397 (Nov. 2012: exhibited edema and tenderness on exam). *See also* Tr. 303, 305, 313, 317, 335, 338, 343-44, 346, 407, 422-23, 427, 451-52. In light of the x-ray and clinical evidence cited above, the Court cannot conclude that plaintiff's upper extremity impairments were no more than "slight abnormalities" that would not be expected to affect plaintiff's ability to perform work related activities. *Farris*, 773 F.2d at 90. Accordingly, the ALJ's conclusion to the contrary is not supported by substantial evidence.

### B. Plaintiff's CAD/Cardiovascular Impairment

Plaintiff was admitted to Christ Hospital on December 9, 2012, for cardiac arrest. (Tr. 475-996). Plaintiff was brought to the hospital after collapsing in public; he did not complain of chest tightness or pressure or throat burning or tightness or palpitations immediately before the episode. (Tr. 475). Nearby paramedics placed him on a monitor and he was noted to be in ventricular tachycardia; he was shocked with a defibrillator and became asystolic; the paramedics continued CPR and plaintiff became responsive in the ambulance on route to the hospital. (*Id.*). While in the hospital, plaintiff experienced a second tachycardia event requiring defibrillation. (Tr. 490). Plaintiff underwent surgery on December 11, 2012, to have a cardioverter defibrillator device implanted. (Tr. 494).

During his hospital admission, plaintiff had 55 to 60 percent ejection fraction in his left ventricle; cavity size, wall thickness, and systolic function were normal. (Tr. 571). The leaflets in plaintiff's aortic and mitral valve were mildly thickened; the left and right atriums were mildly dilated; and there was moderate regurgitation in the tricuspid valve. (*Id.*). The attending physician diagnosed "[t]wo vessel CAD with long 70-80% mid-CFX stenosis and right-PAV branch occlusion" and the operating surgeon opined that plaintiff had "mild to moderate coronary

13

disease."  (Tr. 476, 495).   Plaintiff was discharged on December 13, 2012, and advised to

follow up with weight loss and lifestyle modification.   (Tr. 476-77).

The ALJ determined that plaintiff's CAD did not satisfy the durational requirement for

being classified as a severe impairment.   (Tr. 16).   The ALJ recognized that plaintiff was

hospitalized in December 2012 for tachycardia, but noted there was no evidence in the record

documenting heart problems prior to this incident.   (*Id.*, citing Tr. 475, 494).   The ALJ further

noted that an August 2012 echocardiogram showed no evidence of a heart problem at that time.

(*Id.*, citing Tr. 436-39).   The ALJ therefore found that plaintiff's CAD could not be classified as

a severe impairment for failure to meet the twelve-month durational requirement of 20 C.F.R. §

404.1509.   (*Id.*).   The ALJ further determined that the cardiac diagnostic findings in the record

did not support a finding that plaintiff's CAD was a severe impairment.   The ALJ noted that

during plaintiff's hospitalization, "[his] ejection fraction was measured at fifty-five percent and a

heart catheterization revealed only a seventy to eighty percent blockage in two coronary arteries,

which an attending physician characterized as 'mild to moderate [CAD].'"   (*Id.*, citing Tr. 476,

495).

Plaintiff contends that the ALJ erred by not classifying his CAD as a severe impairment.

Plaintiff asserts the ALJ's statement that his CAD is "not severe because the cardiologist stated

that there was 'mild to moderate stenosis' with a 70-80% blockage" (Doc. 13 at 10) indicates that

the ALJ has an improper understanding of CAD.   Plaintiff contends the cardiologist's

classification of his stenosis as "mild to moderate" means only that "the blockage is not so severe

that angioplasty or a stent are needed."   (*Id.*).   Plaintiff maintains that this blockage is still

14

significant and "one can expect it to cause symptoms" such as the fatigue and chest pains to which plaintiff testified.  (*Id.*, citing Tr. 46-47, 58-59).

The ALJ's decision to classify plaintiff's CAD as non-severe is substantially supported by the record evidence.  Plaintiff's CAD does not meet the 12-month durational requirement of the Social Security Act.  *See* 20 C.F.R. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.").  The record does not reflect that plaintiff had a history of CAD or any other cardiac impairment prior to his cardiac arrest on December 9, 2012.  The ALJ's decision was issued on April 15, 2013, which was only four months after the plaintiff's first CAD episode, and there is no medical evidence in the record since December 2012 showing that plaintiff continues to have significant problems as a result of his CAD.[4]  Insofar as plaintiff relies on his subjective complaints of fatigue and chest pain to establish the ongoing nature of his CAD, there is no medical evidence to substantiate that the fatigue and chest pain he experienced after December 2012 are related to his CAD.  Nor has plaintiff cited to any medical opinion indicating that plaintiff's CAD imposed any work-related limitations, aside from the temporary lifting restrictions imposed shortly after his surgery.  (Tr. 596).  For these reasons, the undersigned finds that the ALJ's decision to classify plaintiff's CAD as nonsevere is substantially supported by the record.

### C.  Obesity

Plaintiff argues the ALJ's RFC formulation – finding that plaintiff can stand and/or walk up to four hours a day – fails to account for the combined effect of his severe obesity and

---

[4]The record includes the results of an August 28, 2012 echocardiogram showing mostly normal findings with an estimated ejection fraction of 60 to 65% in the left ventricle.  (Tr. 436-38).

advanced lower extremity arthritis. (Doc. 13 at 8).

Social Security Ruling (SSR) 02-1p provides that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." SSR 02-1p, 2000 WL 628049, at *1 (2002). Adjudicators must "consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's [RFC]." *Id.*

Here, the ALJ considered plaintiff's obesity as required under SSR 02-1p. It is undisputed that plaintiff is morbidly obese and the ALJ determined that plaintiff's obesity is a severe impairment. *See* Tr. 14. *See also* Tr. 377, 382, 385, 390 (documenting plaintiff's Body Mass Index as 50.37, 48.93, 50.66, and 48.15, all of which establish that plaintiff suffers from obesity). In addition to classifying plaintiff's obesity as a severe impairment, the ALJ accommodated the "limiting effects of [plaintiff's] lower extremity arthritis and obesity [by] limit[ing] him to light work but *further restrict[ing] him* to only four hours of standing each day and limit[ing] him to frequent use of foot controls." (Tr. 20) (emphasis added). The ALJ's severity and RFC findings indicate she properly considered the effect of plaintiff's obesity on his functional capacity.[5]

2. Whether the ALJ erred in weighing the medical opinion evidence.

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight

---

[5] To the extent plaintiff asserts the ALJ's RFC does not properly account for the days of work plaintiff would miss due to arthritis flare ups and his other impairments as Dr. Hartmann opined, this argument is addressed below in connection with the ALJ's decision to give "little weight" to Dr. Hartmann's opinion.

than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(c)(2)(i)(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at

17

544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See also Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (citing SSR 96-2p, 1996 WL 374188 (1996)). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 544 (quoting *Wilson*, 378 F.3d at 544).

The ALJ provided the following discussion in her decision affording "little weight" to Dr. Hartmann's opinion:

> The [ALJ] gives little weight to the opinion of Dr. Hartmann because the doctor did not present relevant evidence to support his opinion or provide any explanation for his opinion. When asked to identify the clinical findings and objective signs, [Dr. Hartmann] responded that [plaintiff] had a BMI of 52 and intermittent joint swelling. But joint swelling is not documented in his progress notes. In fact, during an examination by Dr. Farhey on August 10, 2012, [plaintiff] was noted to have no swelling. Because Dr. Hartmann's opinion is not supported by his own progress notes or other evidence of record, the [ALJ] will give it little weight.

(Tr. 22, citing Tr. 454, 997-1001).

Plaintiff alleges the ALJ erred in giving "little weight" to Dr. Hartmann's treating physician opinion. Plaintiff contends the objective and clinical findings documented in the Christ Hospital Rheumatology Clinic, Primary Care Clinic, Podiatry Clinic and Orthopedic

18

Clinic support Dr. Hartmann's assessment of plaintiff's functional capacity. These records include plaintiff's consistent complaints of joint pain and stiffness, and findings of decreased range of motion, swelling, edema, synovitis, tenderness to palpation, deformities to certain joints, and contracture of plaintiff's elbow. Plaintiff also asserts that as a practitioner at Christ Hospital, Dr. Hartmann had access to all of plaintiff's progress notes from the various clinics and was able to consider those records in formulating his opinion.

The ALJ's decision to give little weight to Dr. Hartmann's opinion is without substantial support in the record. Dr. Hartmann opined that plaintiff has significant limitations in sitting, standing, walking, lifting, reaching, handling, and fingering, and that plaintiff would miss more than four days of work monthly due to his impairments. (Tr. 997-99). In support of the assessed limitations, Dr. Hartmann cited to clinical findings of "BMI: 52" and "intermittent joint swelling." (Tr. 997). The ALJ discounted Dr. Hartmann's opinion on the basis that he failed to present relevant evidence or any explanation in support of his opinion.

While the ALJ properly considered the brevity of Dr. Hartmann's explanation as one factor in weighing the treating physician's opinion, the ALJ's decision does not reflect she considered the other regulatory factors. Even if Dr. Hartmann's opinion may not have been entitled to controlling weight, the ALJ was still obligated to consider the length, nature and extent of his treatment relationship with plaintiff; the frequency of examination; his medical specialty; the evidentiary support for the opinion and its consistency with the record; and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2). The ALJ did comment on Dr. Hartmann's citation to intermittent joint swelling in support of his opinion, but the ALJ stated that joint swelling was not documented in Dr. Hartmann's progress notes,

19

citing to an August 2012 examination that revealed no swelling.  (Tr. 22, citing Tr. 454).  The

ALJ's citation to a single instance of no swelling on one occasion ignores the numerous other

examinations at which swelling or edema was noted, both before and after the August 2012 exam

cited by the ALJ.  *See* Tr. 245, 264, 289, 294, 303, 305, 309, 317, 344, 346, 397, 422.

Moreover, the ALJ's single citation to "no swelling" fails to account for the episodic nature of

plaintiff's inflammatory arthritis, the symptoms of which wax and wane with periods of

flare-ups.  *See* http://www.hopkinsarthritis.org arthritis-info/rheumatoid-arthritis/ra-symptoms

(last visited on September 15, 2015).  *See also Sharp v. Barnhart,* 152 F. App'x 503, 509 (6th

Cir. 2005) (in evaluating an episodic disease, consideration should be given to the frequency and

duration of the disease's exacerbations, the length of the remission and the evidence of any

permanent disabilities); *Cruz v. Astrue*, No. CA 11-638M, 2013 WL 795063, at *14 (D. R.I. Feb.

12, 2013) (Report and Recommendation), *adopted*, 2013 WL 802986 (D. R.I. Mar. 4, 2013)

("With a disease like rheumatoid arthritis that can wax and wane, the duration requirement may

give rise to an exceedingly complex inquiry."); *Montanez v. Astrue*, No. 3:07CV1039, 2008 WL

3891961, at *17 (D. Conn. Aug. 1, 2008) (inflammatory arthritis is a disease "in which the pain

waxes and wanes, with periods of illness or flare-ups alternating with periods of remission").  It

does not appear that the ALJ considered the episodic nature of the disease in assessing Dr.

Hartmann's opinion or plaintiff's RFC.  Nor does it appear the ALJ considered whether Dr.

Hartmann's opinion was consistent with the other Christ Hospital clinic notes to which he had

access.  *See, e.g.,* Tr. 377 (August 20, 2012 office visit with Dr. Hartmann noting plaintiff "saw

rheumatology about 10 days ago for his JIA [juvenile idiopathic arthritis]" and commenting on

results of blood work performed at that time, indicating Dr. Hartmann reviewed those records).

20

Dr. Hartmann was well-aware that plaintiff was being seen by specialists at the rheumatology and other clinics at Christ Hospital and the ALJ should have considered this factor in weighing Dr. Hartmann's opinion.

In addition, the ALJ stated that Dr. Hartmann's opinion is not supported by "other evidence of record" (Tr. 22), but she failed to explain this finding or reference the Rheumatology Clinic and other Christ Hospital clinic records which purportedly support this conclusion. The ALJ was obligated to articulate "good reasons" based on the evidence of record for giving "little weight" to the treating physician's opinion if she chose not to give it controlling weight, *Wilson*, 378 F.3d at 544, and to articulate her analysis of the evidence in such a manner that the reviewing court might follow her reasoning. *Lowery v. Comm'r*, 55 F. App'x 333, 339 (6th Cir. 2003). Contrary to the ALJ's conclusion, it appears that the Christ Hospital clinic records as a whole support Dr. Hartmann's assessment, or at the very least, support greater limitations than those found by the non-examining state agency doctors on which the ALJ relied. Moreover, there is no indication that the ALJ considered the lifting and manipulation restrictions imposed by Dr. Hartmann given the ALJ's finding that plaintiff's upper extremity impairments were nonsevere. The ALJ's reasons for discounting Dr. Hartmann's assessment are impossible to discern from the conclusory statement that the treating physician's opinion was not supported by "other evidence of record." (Tr. 22). The ALJ's failure to articulate the reasons for the weight given to Dr. Hartmann's opinion denotes a lack of substantial evidence. *Blakley*, 581 F.3d at 407.

Rather than relying on the opinion of the treating physician, the ALJ gave "great weight" to the assessments of the non-examining state agency physicians, stating "they narrowly, yet adequately, address the claimant's extensive lower extremity problems and obesity while

21

reflecting the fact that the claimant has less serious physical impairments elsewhere." (Tr. 22).

However, the state agency doctors did not have a significant portion of the medical records in

this case when they rendered their opinions, including any of the rheumatology and other clinic

records from Christ Hospital that showed inflammatory arthritis in both the lower and upper

extremities and Dr. Hartmann's medical assessment of plaintiff's functioning. One factor the

ALJ must consider in weighing medical opinions is "the extent to which an acceptable medical

source is familiar with the other information in [the] case record." 20 C.F.R. §§ 404.1527(c)(6),

416.927(c)(6). A state agency reviewing doctor's opinion may be entitled to greater weight than

that of a treating or examining doctor in certain circumstances, such as when the "State agency

medical . . . consultant's opinion is based on a review of a complete case record that . . . provides

more detailed and comprehensive information than what was available to the individual's

treating source." *Blakley*, 581 F.3d at 409 (quoting SSR 96-6p, 1996 WL 374180, at *3 (July 2,

1996)). However, where a non-examining source has not reviewed a significant portion of the

record and the ALJ fails to indicate that she has "at least considered [that] fact before giving

greater weight" to the reviewing doctor's opinion, the ALJ's decision cannot stand. *Blakley*, 581

F.3d at 409 (internal quotation omitted). In this case, the later-generated treatment notes and

opinions contain a more detailed picture of plaintiff's functionality than the evidence before the

state agency reviewing physicians and indicate a deterioration in plaintiff's functioning that was

not considered by those physicians. The state agency physicians did not review this evidence

prior to proffering their opinions, making their opinions incomplete. For these reasons, the ALJ

erred in giving "great weight" to the opinions of the non-reviewing state agency doctors because

of the significant amount of evidence discussed above that was not in the record at the time of their reviews.

3. The Court need not address plaintiff's credibility argument.

Plaintiff alleges as his third assignment of error that the ALJ erred in assessing his credibility. (Doc. 13 at 11-12). It is not necessary to address plaintiff's credibility argument because on remand the ALJ's reconsideration of the medical and opinion evidence in this matter and plaintiff's RFC may impact the remainder of the sequential evaluation process, including the ALJ's assessment of plaintiff's credibility. *See Trent v. Astrue,* No. 1:09cv2680, 2011 WL 841538, at *7 (N.D. Ohio Mar. 8, 2011). In any event, even if plaintiff's third assignment of error had merit, the result would be the same, i.e., a remand for further proceedings and not an outright reversal for benefits. The Court therefore declines to address plaintiff's third assignment of error.

**III. This matter should be reversed and remanded for further proceedings.**

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the Court notes that all essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of his alleged onset date. *Faucher v. Sec'y of H.H.S.,* 17 F.3d 171, 176 (6th Cir. 1994). This matter should be reversed and remanded for further proceedings with instructions to the ALJ to re-weigh the medical and other opinion evidence in accordance with this decision; to reconsider plaintiff's credibility and RFC; and for further medical and vocational development as warranted.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **REVERSED** and **REMANDED** for further

proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).


Date: _9/16/15_

Karen L. Litkovitz
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

KEITHEN JONES,                                      Case No. 1:14-cv-748
     Plaintiff,                                     Dlott, J.
                                                   Litkovitz, M.J.
    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.


**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn*, 474 U.S. 140 (1985); *United States* v. *Walters*, 638 F.2d 947 (6th Cir. 1981).